**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States,<br><br>            Plaintiff,<br><br>v.<br><br>Leonardo Rabanales-Casia,<br>Domingo Agustin-Simon,<br><br>            Defendants. | No. CR 11-1622-PHX-DGC<br><br>**REDACTED ORDER** |

Defendants Leonardo Rabanales-Casia and Domingo Agustin-Simon are charged with conspiracy to commit hostage taking, hostage taking, bringing aliens into the United States, harboring illegal aliens, and using and carrying a firearm in relation to a crime of violence (hostage taking). Their jury trial started on Monday, October 1, 2012.

On the morning of October 4, 2012, Defendants asked the Court to preclude the government from presenting the testimony of Material Witness 1 that she was raped by Defendant Augustin-Simon while being held at the drop house at issue in this case.[1] Upon encountering this issue for the first time, the Court instructed the government to postpone the testimony of Material Witness 1 for a day so that it would have time to consider the issue more carefully. After hearing arguments of the parties, reviewing documents submitted by the parties, reviewing relevant legal standards, and considering

---

[1] The Court refers to the witness as Material Witness 1 to protect her privacy as a possible rape victim. The Court has docketed under seal for possible appellate review a version of this order that includes her name.

the issue with care, the Court ruled on the morning of October 5, 2012 that the testimony of Material Witness 1 would be admitted. She testified that day. This order provides a more complete explanation of the Court's decision.

### A. Background.

The government first learned of this rape testimony when its lawyers met with Material Witness 1 on September 26, 2012. Counsel for the government immediately emailed defense counsel to advise them of the new evidence. Government counsel also prepared a Jencks disclosure and produced it to defense counsel on September 27, 2012.

Defense counsel responded by raising with the government the possibility of a trial postponement to allow time to prepare for the new evidence. At the final pretrial conference held on the afternoon of September 27, 2012, however, defense counsel did not seek a postponement of the trial and did not otherwise raise with the Court the admissibility of the newly-disclosed rape testimony. Instead, defense counsel waited until the morning of the fourth day of trial – the day Material Witness 1 was scheduled to testify – to raise the issue with the Court.

During argument about this issue on October 4th, defense counsel made clear that they are not arguing that the Jencks disclosure was untimely, nor are they arguing that they have had insufficient time to prepare to meet this evidence. Rather, they argued that the probative value of the rape evidence is substantially outweighed by the danger of unfair prejudice and that the evidence therefore should be excluded under Rule 403. For the reasons set forth below, the Court did not agree.

### B. Probative Value of the Evidence.

To prove hostage taking under 18 U.S.C. § 1203(a), the government must show that Defendants intentionally seized or detained a person. Ninth Circuit Jury Instruction 8.120 sets forth the elements of hostage taking and defines "seized or detained" as being held or confined against one's will by physical restraint, fear, or deception for an appreciable period of time. From the start of their opening statements on October 1, 2012, defense counsel have made clear that the central issue in this case is whether the

1  aliens held in this drop house were seized or detained against their wills.  One defense
2  attorney asserted in his opening statement that all of the aliens held in the drop house
3  agreed to enter this country illegally with the aid of the smugglers; the aliens were willing
4  to risk their lives to enter the United States; the aliens hid themselves in the drop house so
5  they would not be discovered by immigration officials, not because they were seized or
6  detained; the house was dirty, hot, and crowded for everyone, and was simply a "bad
7  hotel"; the drop house merely consisted of "guides and guests"; the aliens helped operate
8  the drop house by cooking food; and the aliens therefore were not seized or detained
9  against their wills.  The other defense attorney asserted in his opening that plywood was
10 placed over the windows of the drop house not to keep the aliens in, but to prevent their
11 detection by immigration officials on the outside; the aliens did not want to leave the
12 house because they would be detected by immigration officials, not because they were
13 detained; the aliens were in a business relationship with the guides and did not want to
14 lose their "investment" (the money they had paid to be smuggled into the United States)
15 by being caught by immigration officials; a gun was used at the house only to restore
16 order after a fight; everyone in the house was working together; and the guides were like
17 modern day Harriet Tubmans.[1]  Defense counsel also explained to the jury that if the
18 aliens were not seized or detained there can be no hostage taking, and if there is no
19 hostage taking there can be no conspiracy to commit hostage taking and no use of a
20 firearm in connection with the violent offense of hostage taking.  Thus, defense counsel
21 sought to defeat the three most serious charges in this case by making the coercive or
22 non-coercive environment in the drop house the key factual issue at trial.

23 Defense counsel have continued this theme through their cross-examination of
24 government witnesses.  They have sought to elicit testimony that this house was like
25 every other house where illegal aliens are harbored while awaiting payment to their

---

[1] Harriet Tubman, of course, ran an underground railroad for escaped slaves during the Civil War.

guides and transportation to other parts of the country; people were told to stay quiet not as a matter of control, but to avoid detection by immigration officials; although some of the women were groped by Defendants and other guards, that is not unusual in such houses and the women in this house stood up to the guards without fear; and the guards shared beer with some of the aliens and agreed to buy better food when the aliens complained about what they were being fed. As defense counsel summarized during the argument on October 4th, the defense position is that this house was not "bad enough" for the aliens to have felt intimidated or to have been detained against their wills.

Evidence that one of the aliens was raped by one of the guards at the house, and that other guards were aware of and had at least some complicity in the rape, is highly probative on the central issue created by the defense: whether the house was truly violent and controlling as the government contends, or whether it simply was the kind of "bad hotel" that exists every time illegal aliens pay to be smuggled into the United States. The rape evidence strongly corroborated testimony by material witnesses that Defendants have sought diligently to call into question – that the house was violent, the threats were real, Defendants were controlling, aliens were intimidated, and aliens were held against their wills. The evidence is particularly probative in light of the defense strategy to portray the house as merely a cooperative and collective effort among "guides and guests." It is noteworthy that Defendants chose to pursue this defense strategy after the rape evidence had been disclosed to them and without challenging that evidence before the Court. Defendants cannot claim to have settled on their strategy without knowing that the government would seek to present evidence of the rape.

Moreover, to be found guilty of hostage taking, Defendants need only to have seized and detained one person. The superseding indictment specifically identifies Material Witness 1 as one of the aliens who was seized and detained. Doc. 42 at 3. Evidence that she was raped by Defendant Augustin-Simon while at the house is directly relevant to the question of whether she was seized or detained against her will by physical restraint or fear. She testified that Defendant Augustin-Simon forced himself

upon her in the back yard of the house. Another witness testified that one of the guards blocked the door to the back yard after Defendant Augustin-Simon took Material Witness 1 into the back yard, and Material Witness 1 testified that this guard stood at the back door and laughed at her when she returned to the house in tears. The evidence thus will tend to show that the guards at the house collectively used violence and force. The evidence is highly relevant to the question of whether Material Witness 1 was seized or detained.

### C. Risk of Unfair Prejudice.

Unfair prejudice occurs when evidence leads a jury to make its decision on factors other than the merits of the case, commonly on the basis of emotion, but also on any other basis not justified by the evidence. Vol. 2, Weinstein's Federal Evidence, § 403.04[1][b] (Matthew Bender 2d ed. 2012). Certainly there is a risk that the jury will react emotionally to rape evidence. The Court cannot conclude, however, that the risk substantially outweighs the probative value of the evidence as discussed above. The government did not elicit details of the rape during Material Witness 1's testimony; it presented the evidence with a minimum of elaboration. Defendants challenged the veracity of the rape testimony, presenting evidence that Material Witness 1 did not disclose the rape in her first several interviews with law enforcement and mentioned it only on the eve of trial when she knew which Defendants were going to trial. Following Material Witness 1's testimony, the Court gave this instruction to the jury:

> You have heard testimony from Material Witness 1 about a sexual assault. I want to instruct you that you are to consider this testimony only as it relates to the specific offenses charged in this case, and for no other purpose. The defendants are on trial only for the crimes charged in the superseding indictment. I want to further remind you that you must decide this case solely on the evidence and the law, and must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.

At the close of the case, the Court will also instruct the jury that they must consider the

1  charges against Defendant Rabanales-Casia, who is not alleged to have committed the
2  rape, separately and only on the basis of the evidence produced against him.[2]

3  The Court also concludes that the risk of unfair prejudice is mitigated by the nature of the evidence in this case. The government has presented evidence that an alien was beaten at the house by the guards and that women aliens repeatedly were groped against their wills, with the guards frequently touching their breasts and buttocks. The government has also presented evidence that the guards repeatedly solicited sex from the women and that one guard lay down between two of the women and kept attempting to put his hand into a tear in the trousers of Material Witness 1. Defendants have not objected to the admission of this evidence.

Moreover, at the request of the parties, the Court informed prospective jurors during voir dire that this case would include evidence of unwanted sexual contact between guards and women aliens. The prospective jurors were asked whether such evidence would make it difficult for them to serve as fair and impartial jurors in this case. Those who responded affirmatively were not seated on the jury.

In sum, the Court concludes that the defense strategy of portraying this drop house as a typical alien smuggling operation that was expected and bargained for by the aliens, and therefore was not a house of violence, intimidation, or restraint, makes the rape testimony highly probative on the charge of hostage taking. Given the nature of this case, the circumspect manner in which the government presented the rape evidence, and the screening of jurors during voir dire, the Court does not find that the risk of unfair prejudice presented by the evidence substantially outweighs its probative value.[3]

---

[2] The Court notes that Defendant Rabanales-Casia did not seek a severance after the existence of the rape evidence was disclosed, nor is the Court convinced that such evidence would have been grounds for a severance. *See United States v. Corrales-Fernandez*, 2009 WL 1026294 (D. Ariz. Apr. 16, 2009) (denying motion to sever in a hostage taking case where evidence against one defendant would show that he sexually assaulted an alien in the drop house).

[3] Defendants suggested in their argument on October 4th that the rape evidence is not

DATED this 10th day of October, 2012

_____
David G. Campbell
United States District Judge

---

relevant. For reasons discussed above, the Court finds it highly relevant. The Court has also considered whether the rape evidence should be precluded under Rule 404(b). The Court concludes that Rule 404(b) does not apply because the evidence is not "other acts" evidence, but instead is evidence of actions taken by Defendant Agustin-Simon in this case, against one of the women aliens in this case, during the time of the offenses charged in the superseding indictment, and therefore is a part and parcel of the offenses charged. Moreover, if Rule 404(b) were to be applied, the Court would find it satisfied under the Ninth Circuit's three-part test that applies when the evidence is not admitted to show intent. (1) The evidence tends to prove a material point – the coercive and abusive nature of Defendants' conduct, which is directly relevant to whether the aliens were seized or detained. (2) Material Witness 1's testimony is sufficient to support a finding that Defendant Augustin-Simon committed the rape. (3) The alleged rape occurred during Material Witness 1's stay in the house and during the time of the crimes charged in this case, and therefore is not too remote in time. *See United States v. Smith*, 282 F.3d 758, 768 (9th Cir.2002).